FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 0 4 2009

JAMES N. HATTEN, Clerk
By [signature]



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| CHARLES K. MILLER, derivatively on behalf of SYNOVUS FINANCIAL CORP., | Civil Action No. |
| Plaintiff, | |
| v. | **1 09-CV-3069** |
| RICHARD E. ANTHONY, DANIEL P. AMOS, GARDINER W. GARRARD, JR., J. NEAL PURCELL, T. MICHAEL GOODRICH, MELVIN T. STITH, JAMES H. BLANCHARD, V. NATHANIEL HANSFORD, PHILLIP W. TOMLINSON, RICHARD Y. BRADLEY, MASON H. LAMPTON, WILLIAM B. TURNER, JR., FRANK W. BRUMLEY, ELIZABETH C. OGIE, JAMES D. YANCEY, ELIZABETH W. CAMP, H. LYNN PAGE, FREDERICK L. GREEN III, THOMAS J. PRESCOTT, MARK G. HOLLADAY, and ALFRED W. JONES III, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| SYNOVUS FINANCIAL CORP., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Charles K. Miller ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Synovus

Financial Corp. ("Synovus" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from January 2008 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, Synovus is a diversified financial services company and a registered bank holding company based in Georgia.  The Company provides financial services, including commercial and retail banking, financial management, and insurance, mortgage and leasing services.

3.     During the Relevant Period, defendants caused the Company to issue materially false and misleading statements regarding the Company's business and financial results. Defendants engaged in improper behavior, which harmed Synovus and its investors by failing to disclose the extent of its substantial exposure to inherently risky lending practices, particularly with respect to its massive exposure to the Sea Island Company ("Sea Island"), a resort in Georgia, the financial condition of which greatly deteriorated throughout the Relevant Period.

4.     In fact, defendants issued virtually no disclosures regarding Sea Island in any of its Relevant Period SEC filings, ***despite the fact that Sea Island was the***

***Company's single largest customer***, and it was struggling mightily with its ambitious expansion plan, which was largely financed by Synovus. Defendants also failed to adequately record losses for the Company's other myriad impaired loans in a timely manner, causing its financial results to be materially false and misleading throughout the Relevant Period.

5.     As a result of defendants' false and misleading statements, the Company's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $13.49 per share on February 1, 2008.

6.     During the summer and fall of 2008, Synovus stock declined as defendants caused the Company to announce additional loan losses and non-performing assets.  However, the stock continued to be artificially inflated as defendants concealed the full extent of Synovus's exposure to mortgage-related credit issues.

7.     In the summer of 2008, defendant Alfred W. Jones III ("Jones"), the chief executive officer ("CEO") of Sea Island, resigned from the Board of Synovus. Simultaneously, Synovus's former CEO, defendant James H. Blanchard ("Blanchard"), resigned from Sea Island's board of directors.   However, defendants continued to conceal the extent of the Company's exposure to Sea Island and did not disclose Sea Island's deteriorating condition (or virtually

anything about Sea Island), which materially threatened its ability to stay "current"

on the Company's financing.

8.     On January 2, 2009, defendants caused the Company to issue a press

release entitled "Synovus Announces Updated Outlook for Fourth Quarter of

2008," which stated in part:

> Synovus, the Columbus, Georgia-based financial services company, announced today its updated outlook for the fourth quarter of 2008.
>
> Synovus expects its fourth quarter loan loss provision, ORE liquidation costs, and charge-offs to remain at elevated levels related to current economic conditions. Synovus also expects to increase its loan loss reserve during the quarter. The current estimate for the fourth quarter loan loss provision is approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%. The largest component of these elevated charges relates to Atlanta market residential real estate credits. Additionally, Synovus is assessing its goodwill for potential impairment during the fourth quarter.

9.     Notably, the January 2, 2009 press release failed to even mention the

Company's largest customer, Sea Island, let alone quantify the massive exposure

the Company faced due to Sea Island's "underperforming" loans.

10.    Subsequently, on January 3, 2009, defendants caused the Company to

issue a press release correcting the previously announced outlook for the fourth

quarter of 2008, to dramatically increase the expected charge-off ratio from 2.2%

to 3.2%. The correction stated in part:

> On January 2, 2009, Synovus Financial Corp., the Columbus, Georgia-based financial services company, issued a press release that incorrectly stated the Company's current estimate for the fourth quarter loan loss provision as approximately $250 million with a

- 4 -

fourth quarter estimated charge-off ratio of approximately 2.2%. The correct current estimate for the fourth quarter loan loss provision is approximately $350 million with a fourth quarter estimated charge-off ratio of approximately 3.2%.

11.     On January 13, 2009, *Bloomberg* reported that the Company's commercial real estate could see a second wave of loan losses and referenced a cessation of lending into the hotel sector:

> Synovus, which reports quarterly results on Jan. 22, said Jan. 2 that losses on loans and uncollectible debt will "remain at elevated levels." The Columbus, Georgia-based company plans to reserve about $250 million to help cover Atlanta real-estate loans. The bank said in November it would sell the U.S. government's Troubled Asset Relief Program $973 million in preferred stock and warrants.
>
> The lender has had five quarters of lower profit and losses, and its stock has fallen 44 percent in 12 months, compared with 28 percent for the KBW Regional Bank Index. The bank's real-estate loan portfolio makes up 78 percent of total loans, according to Deutsche Bank data. Almost a fifth of loans are in commercial real-estate projects like shopping centers and hotels, Synovus spokesman Patrick Reynolds said in an interview Jan. 6.
>
> "Stopped Lending"
>
> Synovus "stopped lending to any new projects in the retail sector, in the shopping sector, or the hotel sector" in June, Reynolds said.

12.     After these disclosures, Synovus stock continued to decline, falling to as low as $4.51 per share on January 20, 2009, a decline from $5.56 per share on January 16, 2009, and a decline of 66% from the Company's Relevant Period high of $13.49 per share in February 2008.

13.     Subsequently, on January 22, 2009, defendants caused the Company to issue its financial results for the fourth quarter of 2008 in a release which stated in part:

Synovus reported a net loss for the fourth quarter of 2008 of $637 million, or $1.93 per share, compared to income from continuing operations of $53.1 million, or $0.16 per diluted share for the fourth quarter of 2007. The fourth quarter 2008 results include provision expense of $364 million and a $443 million non-cash goodwill impairment charge. Excluding the goodwill impairment charge, Synovus' net loss would have been $195 million, or $0.59 per share, for the quarter.

For the full year 2008, Synovus reported a net loss of $584 million, or $1.77 per share, compared to income from continuing operations of $343 million, or $1.04 per share for 2007. Excluding the goodwill impairment charges of $480 million in 2008, Synovus' net loss would have been $105 million, or $0.32 per share, for the year.

Synovus previously announced that it was reviewing its goodwill for potential impairment. Based on the results of this review, Synovus recorded a non-cash $443 million (pre-tax and after-tax) goodwill impairment charge during the fourth quarter of 2008. This charge had no impact on Synovus' tangible capital levels, regulatory capital ratios, or liquidity. Additionally, goodwill impairment has no connection to or utilization of capital received from the U.S. Treasury as part of the Capital Purchase Program.

"As the economy continued to deteriorate in the fourth quarter, credit quality in the residential construction and development portfolios, especially in Atlanta, continued to weaken," said Richard Anthony, Chairman and CEO. "We are taking actions to recognize and liquidate these non-performing credits as efficiently and economically as possible. During the fourth quarter, our sequential quarter core deposit growth was 11 % (annualized). We believe this puts us in a very strong liquidity position at the end of one of the worst years the financial services industry has faced. Additionally, in the fourth quarter, we received approximately $968 million from the sale of preferred stock and warrants to the U.S. Treasury as part of the government's Capital Purchase Program. As of December 31, 2008, our Tier 1 Capital Ratio was 11.22%, Total Risk-Based Capital Ratio was 14.55%, and Tangible Common Equity to Tangible Assets Ratio was 7.91%. We believe the strength of our liquidity and strong capital structure positions us well for the future."

The provision expense for the quarter was $363.9 million, compared to $151.4 million last quarter. The provision for loan losses covered net charge-offs by 159% for the quarter. For the full year 2008, provision expense of $700 million exceeded net charge-offs by $231 million. The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 4.16%, as of December 31, 2008, compared to 3.58% last quarter. Nonperforming loans were $922 million as of December 31, 2008, an increase of $152 million from the third quarter of 2008. The Atlanta market represents 29% of Synovus' total loans in the residential construction and development

portfolios and 45% of the nonperforming loans in the residential construction and development portfolios.

The net charge-off ratio for the quarter was 3.25% compared to 1.53% last quarter. The net charge off ratio for the full year 2008 was 1.71 %. The allowance for loan losses was 2.14% of loans as of December 31, 2008, compared to 1.68% as of September 30, 2008.

\*       \*       \*

Anthony concluded, "As we look out into 2009, we are fully committed to actively and aggressively deal with our non-performing assets through the activities of our front line bankers as well as the separate subsidiary structured to enhance this capability from the corporate level. We believe continued strong core deposit growth and the U.S. Treasury funds enable us to be aggressive in resolving these credit issues while allowing us to look to the future for growth."

14.     On this news, Synovus stock fell to as low as $4.52 per share before it closed at $4.75 per share on January 22, 2009.

15.     The true facts, which defendants failed to disclose during the Relevant Period, were as follows:

> A. The Company's assets contained hundreds of millions of dollars worth of impaired and risky securities, many of which were backed by real estate that was rapidly dropping in value for which defendants had failed to record adequate loan loss reserves;
>
> B. Prior to and during the Relevant Period, defendants had been extremely aggressive in granting credit to other companies, including to Sea Island (its largest customer), where top officers of each company sat on each other's boards and whose enormous

development projects were highly risky, and would be enormously problematic if the value of residential real estate did not continue to increase and if the tourism market slowed, which was then already occurring;

C. The Company's largest customer, Sea Island, was performing extremely poorly -- so much so that by August 2008, Sea Island laid off 25% of its staff;

D. Defendants failed to properly account for Synovus's real estate loans, failing to reflect impairment in the loans;

E. The Company's balance sheet included hundreds of millions of dollars in impaired goodwill which had not been recorded as losses on a timely basis;

F. Defendants had not adequately reserved for loan losses and goodwill impairment such that the Company's financial statements were presented in violation of Generally Accepted Accounting Principles ("GAAP"); and

G. Synovus was not on track to report the earnings being forecast for the Company.

16.    As a result of defendants' false and misleading statements, Synovus

stock traded at inflated levels during the Relevant Period.   After the above revelations were made public, the price of the Company's common stock plummeted, losing more than 66% from its Relevant Period high prior to Defendants' "corrective" disclosures.

17.   As a result of defendants' breaches of their duties, the Company has been damaged and has never recovered.   Most recently, on October 23, 2009, Defendants disclosed third-quarter 2009 losses for the Company of $437.7 million, or $1.27 per share, up sharply from a loss of $40.1 million, or 12 cents per share, for the same period in 2008.   The Company's non-performing assets totaled $918.5 million, nearly double the year-ago figure, and net charge-offs (loans written off as not being repaid) totaled nearly $496.8 million, up nearly four times the total from a year ago.

18.   Accordingly, the Company's stock price has never recovered and currently trades for just over $2 per share.

## JURISDICTION AND VENUE

19.   This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.   This action is not a collusive action designed to confer jurisdiction on a court of the United States

that it would not otherwise have.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Synovus maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Synovus occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

22.     Plaintiff is a current shareholder of Synovus and has continuously held Synovus stock since August 1, 1996. Plaintiff is a citizen of Pennsylvania.

23.     Nominal defendant Synovus is a Georgia corporation headquartered in

Columbus, Georgia.  According to its public filings, Synovus is a diversified financial services company and a registered bank holding company.

24.    Defendant Richard E. Anthony ("Anthony") has served as a director of the Company since 1993.  In addition, defendant Anthony has served as CEO since July 2005, and has also served as President of the Company since June 2009. Upon information and belief, defendant Anthony is a citizen of Georgia.

25.    Defendant Daniel P. Amos ("Amos") has served as a director of the Company since 2001.  Upon information and belief, defendant Amos is a citizen of Georgia.

26.    Defendant Gardiner W. Garrard, Jr. ("Garrard") has served as a director of the Company since 1972.  Upon information and belief, defendant Garrard is a citizen of New York.

27.    Defendant J. Neal Purcell ("Purcell") has served as a director of the Company since 2003.  In addition, defendant Purcell has served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period. Upon information and belief, defendant Purcell is a citizen of Georgia.

28.    Defendant T. Michael Goodrich ("Goodrich") has served as a director of the Company since 2004.  Upon information and belief, defendant Goodrich is a citizen of Alabama.

29.     Defendant Melvin T. Stith ("Stith") has served as a director of the Company since 1998. In addition, defendant Stith has served as a member of the Audit Committee during the Relevant Period.   Upon information and belief, defendant Stith is a citizen of New York.

30.     Defendant Blanchard has served as a director of the Company since 1972. In addition, defendant Blanchard served as CEO of Synovus from 1971 until July 2005, and as a director of Sea Island from at least 2005 until July 2008. Upon information and belief, defendant Blanchard is a citizen of Georgia.

31.     Defendant V. Nathaniel Hansford ("Hansford") has served as a director of the Company since 1985.   Upon information and belief, defendant Hansford is a citizen of Georgia.

32.     Defendant Phillip W. Tomlinson ("Tomlinson") has served as a director of the Company since 2008.   Upon information and belief, defendant Tomlinson is a citizen of Maryland.

33.     Defendant Richard Y. Bradley ("Bradley") has served as a director of the Company since 1991.   Upon information and belief, defendant Bradley is a citizen of Georgia.

34.     Defendant Mason H. Lampton ("Lampton") has served as a director of the Company since 1993. Upon information and belief, defendant Lampton is a

citizen of Georgia.

35.     Defendant William B. Turner, Jr. ("Turner") has served as a director of the Company since 2003.  Upon information and belief, defendant Turner is a citizen of Georgia.

36.     Defendant Frank W. Brumley ("Brumley") has served as a director of the Company since 2004.  Upon information and belief, defendant Brumley is a citizen of South Carolina.

37.     Defendant Elizabeth C. Ogie ("Ogie") has served as a director of the Company since 1993.  Upon information and belief, defendant Ogie is a citizen of Georgia.

38.     Defendant James D. Yancey ("Yancey") has served as a director of the Company since 1978.  Upon information and belief, defendant Yancey is a citizen of Georgia.

39.     Defendant Elizabeth W. Camp ("Camp") has served as a director of the Company since 2003.  In addition, defendant Camp has served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Camp is a citizen of California.

40.     Defendant H. Lynn Page ("Page") has served as a director of the Company since 1978.  In addition, defendant Page has served as a member of the

Audit Committee during the Relevant Period. Upon information and belief, defendant Page is a citizen of Georgia.

41.    Defendant Frederick L. Green III ("Green") served as a director of the Company from 2006 until May 2009. In addition, defendant Green served as the Company's President and Chief Operating Officer ("COO") from at least 2006 until his "resignation" in May 2009.[1] Upon information and belief, defendant Green is a citizen of Georgia.

42.    Defendant Thomas J. Prescott ("Prescott") has served as Chief Financial Officer ("CFO") of the Company since 1996. Upon information and belief, defendant Prescott is a citizen of Georgia.

43.    Defendant Mark G. Holladay ("Holladay") has served as Chief Risk Officer and Executive Vice President of the Company since 2008. Upon information and belief, defendant Holladay is a citizen of Georgia.

44.    Defendant Jones served as a director of the Company from 2001 until his "resignation" in July 2008. In addition, defendant Jones has served as Chairman and CEO of Sea Island throughout the Relevant Period.

45.    Collectively, defendants Anthony, Amos, Garrard, Purcell, Goodrich,

---

[1] Following defendant Green's resignation, he entered into a Consulting Agreement with the Board (the "Consulting Agreement"), which is effective until November 30, 2010. Pursuant to the Consulting Agreement, defendant Green receives $31,288 per month ($375,456 annually).

Stith, Blanchard, Hansford, Tomlinson, Bradley, Lampton, Turner, Brumley, Ogie, Yancey, Camp, Page, Green, Prescott, Holladay, and Jones shall be referred to herein as "Defendants."

46.     Collectively, defendants Camp, Page, Stith, and Purcell shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

47.     By reason of their positions as officers, directors, and/or fiduciaries of Synovus and because of their ability to control the business and corporate affairs of Synovus, Defendants owed Synovus and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Synovus in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Synovus and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Synovus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

48.     Defendants, because of their positions of control and authority as

directors and/or officers of Synovus, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Synovus, each of the Defendants had knowledge of material non-public information regarding the Company.

49.    To discharge their duties, the officers and directors of Synovus were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Synovus were required to, among other things:

> A. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> B. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and
>
> C. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

50.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

A. Review and discuss with management the Company's annual audited consolidated financial statements;

B. Consider the effectiveness of the Company's internal control systems;

C. Meet with management to review the Company's major financial risk exposures;

D. Meet to review and discuss with management exposures and the steps taken by management to monitor and control such exposures relating to credit risk, including the level and adequacy of the allowance for loan and lease losses, the level of credit concentrations and compliance with applicable policies, limits, activities and procedures; and

E. Review the effectiveness of the system for monitoring compliance with laws and regulations.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

51.     Synovus, incorporated in 1972, is a diversified financial services company and a registered bank holding company.   The Company provides financial services, including commercial and retail banking, financial management, and insurance, mortgage and leasing services.

52.     The Company offers services to its customers through 31 wholly owned subsidiary banks and other offices in Georgia, Alabama, South Carolina, Florida and Tennessee.   The Company's bank subsidiaries offer commercial banking services, including commercial, financial, agricultural and real estate

loans, and retail banking services. Its services include accepting customary types of demand and savings deposits; making individual, consumer, installment and mortgage loans; safe deposit services; leasing services; automated banking services; automated fund transfers; Internet based banking services; and bank credit card services, including MasterCard and Visa services. Synovus provides various other financial services to customers through wholly owned non-bank subsidiaries.

53.     In late 2007, Synovus spun off its credit card processing subsidiary, Total System Services ("TSYS"), when Bank of America began shifting its consumer card processing in house. Bank of America had been TSYS's largest customer, accounting for 25% of TSYS's revenues and 10% of Synovus's revenues. Following the spin-off, Synovus was much more dependent on its core banking operations.

54.     One large banking-related exposure Synovus had by late 2007 involved a large financing outstanding to the Sea Island resort located on the Georgia coast. Sea Island's Chairman and CEO, defendant Jones (who was also a director of Synovus), embarked on an ambitious project from 2004 to 2006 to convert Sea Island from a regional destination catering to select wealthy families in the southeast to a worldwide destination.

55.     In an effort to finance this enormous makeover, Jones turned to his good friend, defendant Blanchard, who was then the CEO of Synovus.

56.     Synovus was the "lead lender" for Sea Island and gradually increased its exposure to hundreds of millions of dollars.  The market was generally aware of Synovus's involvement at Sea Island, but not the extent of Synovus's exposure to Sea Island, nor was the extent of Sea Island's deteriorating condition made public since Sea Island was a private company and Defendants made virtually no disclosures in the Company's SEC filings concerning it.

57.     This proved to be a critical breach of duty because, as alleged herein, during the tumultuous times of 2008, Defendants were purportedly updating the market regarding the Company's most risky debt exposure.  As alleged herein, those general disclosures were themselves misleading, but to omit Sea Island from these disclosures altogether (which was the case), was a deliberate, unconscionable breach of duty.

58.     Sea Island's development project turned out to be much more expensive than planned with the cost per hotel room exceeding $1 million, compared to a typical five-star hotel which can be built for $400,000 per room. These cost overruns increased the risk level for the project and magnified any shortfall in revenue.  The project overruns coincided with a huge downturn in

tourism nationally, which hammered Sea Island's occupancy and "rack" rates.

59.    As the real estate market took a turn for the worse in 2007,

Defendants said next to nothing about Sea Island and, when asked about Sea Island

(which is the only time they would even address it), generally assured investors it

was not a problem.

60.    After releasing the Company's third quarter 2007 earnings, which

curiously lacked any mention of Sea Island, on October 25, 2007, Defendants

hosted a conference call for analysts, investors and media representatives where

the Sea Island project was specifically addressed:

> [ANALYST:] Outside of those two markets, the Carolina and Georgia
> costal markets, places like Sea Island, and what are you seeing in
> those areas? What's happening in risk classifications in C&I? You are
> seeing spill over I guess outside the development part?

> [ANTHONY:] Tony, I'll ask Mark to go into more detail, but the
> markets by state that we really have not had any problems with the
> South Carolina, Tennessee and Alabama. And Georgia, outside of the
> ones we just mentioned in Atlanta. And he can go over the details by
> state . . . .

> \*       \*       \*

> [HOLLADAY:] *Tony, I heard you asked about Sea Island. I can tell
> you that area is believe it or not, doing very well. Their, you know,
> sales are on target, their occupancies in the resorts are high. And we
> have really not seen anything that gives us any lack of confidence
> there.*

61.    By mid-January 2008, following the spin-off of TSYS, Synovus's

stock was trading at less that $11 per share.

**<u>Defendants' False and Misleading Statements Issued During the Relevant Period</u>**

62.     On January 24, 2008, Defendants caused Synovus to report its fiscal 2007 financial results, which included its fourth quarter 2007 results, in a release which stated in part:

> Synovus reports diluted earnings per share of $1.60 for 2007 compared to $1.90 for 2006. Net income was $526.3 million for the year compared to $616.9 million last year. The 2007 results include $31.0 million (net of income taxes and minority interest) in expenses related to the distribution of Synovus' ownership interest in TSYS to Synovus' shareholders in a spin-off transaction and $22.5 million (net of income taxes) of litigation expenses associated with indemnification obligations arising from Synovus' ownership interest in Visa. Excluding these expenses, diluted earnings per share for 2007 was $1.76. The 2006 results included $33.2 million (net of income taxes and minority interest) for the impact of the Bank of America contract termination fee of $68.9 million, which was partially offset by the acceleration of the amortization of related contract acquisition costs of $6.0 million. Excluding these items, diluted earnings per share for 2006 was $1.80.
>
> For the fourth quarter, diluted earnings per share was $0.25 compared to $0.54 for the fourth quarter of 2006. Net income was $81.9 million for the fourth quarter compared to $175.5 million for the same period last year. The fourth quarter of 2007 results include $25.0 million (net of income taxes and minority interest) in expenses related to the distribution of Synovus' ownership interest in TSYS to Synovus' shareholders in a spin-off transaction and $15.2 million (net of income taxes) in Visa litigation expenses. Excluding these expenses and the aforementioned 2006 contract termination fee, diluted earnings per share for the fourth quarter of 2007 was $0.37, compared to $0.44 in the same period a year ago.
>
> Shareholders' equity at December 31, 2007, was $3.44 billion, which represented a strong 10.45% of year-end assets. Total assets ended the year at $32.9 billion, an increase of 3.3% over December 31, 2006. The ratio of nonperforming assets to loans and other real estate was 1.67%, compared to 1.16% last quarter and 0.50% at December 31, 2006. The net charge-off ratio for the fourth quarter of 2007 was 0.91% compared to 0.51% last quarter and 0.39% in the fourth quarter of last year. The allowance for loan losses at December 31, 2007 was 1.39% of loans, compared to 1.38% last quarter and 1.28% at December 31, 2006. The provision for loan losses covered net charge-offs by 1.18x for the quarter.

Synovus Chairman and Chief Executive Officer Richard E. Anthony said, "2007 was a challenging year for credit. We continued to experience further weakness in our residential construction and residential development portfolios. These loan categories represent 54.1 % of nonperforming loans at the end of the year and 41.7% of net charge-offs recognized in 2007. We continue to take actions to aggressively manage these portfolios. The increases in nonperforming residential construction and development loans were in the panhandle of Florida, Atlanta, and Tampa Bay areas. At December 31, 2007, 70% of Synovus' total nonperforming assets and 81% of total residential construction and development nonperforming loans are in these markets."

Income from continuing operations (which represents the previously reported net income for the Financial Services segment) was $53.1 million for the fourth quarter of 2007 compared to $105.0 million for the fourth quarter last year. Excluding the Visa litigation related expenses, fourth quarter 2007 income from continuing operations was $68.3 million. Net interest income was $286.7 million compared to $288.9 million in the fourth quarter of last year. Total loans grew 7.5% in 2007. On a sequential quarter basis (annualized), commercial and industrial loans grew 8.7% and retail loans grew 13.5% while commercial real estate loans grew 12.5%. Residential construction and development loans declined 1.9%. Total core deposits (excludes brokered time deposits) increased 0.7% over the fourth quarter of 2006. The net interest margin for the quarter was 3.86%, compared to 3.97% last quarter and 4.16% in the fourth quarter of last year. Of the 11 basis point decrease in the net interest margin from the previous quarter, 7 basis points were due to a higher level of interest charge-offs and nonperforming assets.

63.    Notably, Defendants' January 24, 2008 press release failed to even mention the Company's single largest customer, Sea Island.

64.    After releasing the Company's fourth quarter 2007 and fiscal year 2007 earnings on January 24, 2008, Defendants hosted a conference call for analysts, investors and media representatives where the Sea Island project was specifically addressed:

[PRESCOTT:] [Y]ou'll see TSYS that's presented in discontinued operations line, and we'll certainly discontinue talking about TSYS

going forward, but just one more time, I got to say that our great subsidiary has now been spun has left us in great order, and had a great year in 2007, and a great finish to that.

*   *   *

[GREEN:] *We've been aggressive in our approach of recognizing problems and reserving appropriately.*

*This past quarter we've reviewed our entire portfolio with a fine-tooth comb. The purpose was to recognize all of our problems as quickly as possible and to make sure that we're not inadvertently dragging current problems into future periods. So at this point, our credit issues have been contained both geographically and by product type. . . .*

*I also want to point out a little bit about how aggressively – or how I guess, I should say conservatively, we're looking at loans and reserving appropriately.* And we've never shared this with you, but our methodology for these types of loans that I just discussed, we would allocate 22.7% reserves on all loans that migrate to substandard but are still accruing. So at this point in which we're concerned about their ability to continue to pay us, but they haven't hit that point. They're still accruing the interest. We reserve 22.7% of the value of that loan.

If these loans continue to deteriorate and we recognize that they can no longer perform, we'll run an impairment test that calls for us to get a current fair value appraisal, discounted about 10% for selling costs. We can work through the [math], but generally, a $4 million loan that might have had an original appraisal of 5 to 8% after we reserve – again, still accruing, That loan is around 60% of the original amount.

If we look at the loans that this quarter have moved into our MPA category compare the charge offs that were result of this going through this impairment task that I just mentioned, the charge offs have actually been less in the aggregate than the 22.7% reserve. We previously established – we continue to establish as these type loans migrate towards that substandard category.

So again, we are attacking the problem as quickly as possible. We're aggressively working through it. And our desire is as this credit cycle turns, we'll be the first to come out of it.

65.    Based on Defendants' assurances, analysts forecasted that Synovus would have earnings of $0.98 per share in 2008.

66.    Synovus stock, which had dropped to $10.80 per share after the spin-

- 23 -

off of TSYS, rebounded to above $13 per share following Defendants' positive statements.

67.    In March 2008, Bear Stearns imploded, avoiding insolvency only through the involvement of the Federal government and J.P. Morgan. Other financial institutions' stock prices dropped at this time.   While the Company's stock price dropped somewhat on this news, it soon recovered due to Defendants' assurances.

68.    On April 24, 2008, Defendants caused Synovus to report its first quarter 2008 financial results in a release that stated in part:

> Synovus reports net income for the first quarter of 2008 totaling $81.0 million, or $0.24 per diluted share, compared to income from continuing operations of $100.4 million, or $0.30 per diluted share, for the first quarter of 2007.
>
> Return on average assets from continuing operations for the quarter was 0.99% and return on average equity from continuing operations was 9.43% compared to 1.33% and 10.91%, respectively, in the same period last year. Shareholders' equity on March 31, 2008, was $3.53 billion, which represented a very strong 10.45% of quarter-end assets. Total assets ended the quarter at $33.8 billion, an increase of 7.5% for continuing operations from the same period last year.
>
> The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 2.49%, compared to 1.67% last quarter and 0.68% in the first quarter of last year. Of the $173 million increase in nonperforming loans, 84% was in the Atlanta area. The net charge-off ratio for the quarter was 0.95% compared to 0.91% last quarter and 0.13% in the first quarter of last year. The allowance for loan losses was 1.46% of loans at March 31, compared to 1.39% at the end of last quarter and 1.30% at March 31, 2007. The provision expense for the quarter was $91.0 million, compared to $70.6 million last quarter, and $20.5 million in the first quarter last year. The provision for loan losses covered net charge-offs by 143% for the quarter.

"I am confident that we will come out of this credit cycle as a strong financial services institution," said Synovus Chairman and Chief Executive Officer Richard E. Anthony. "With the deterioration in our residential construction and residential development portfolios, primarily in and around Atlanta, we continue to take actions to aggressively deal with these portfolios and get these issues behind us as quickly as possible. The Atlanta portfolio represents 58% of Synovus' total nonperforming loans in the residential construction and development portfolios. The residential construction and development portfolios in Florida have become more stable than the Atlanta area portfolios. Our primary focus is to proactively manage the credit issues until they are resolved so that we can be the high performing company that we have historically been. We have added resources in our special assets group and are working with our customers to assist them during this challenging economic environment. We believe that our strong capital position gives us the capability to work through this situation effectively."

Net interest income was $278.6 million compared to $282.9 million in the first quarter of last year. Total loans grew 9.4% (first quarter annualized). Commercial income producing properties grew 25.4%, commercial and industrial loans grew 12.3% and retail loans grew 5.1%, while residential construction loans declined 15.3%, and residential development loans remained flat with a 0.6% increase. Total core deposits (excludes brokered deposits) declined 2.0% from the first quarter of 2007. The net interest margin for the quarter was 3.71%, compared to 3.86% last quarter and 4.05% in the first quarter of last year. Of the 15 basis point decrease in margin from the previous quarter, 3 basis points were related to increased credit costs.

69.     Notably, the April 24, 2008 press release failed to even mention the Company's single largest customer, Sea Island.

70.     After releasing the Company's first quarter 2008 earnings on April 24, 2008, Defendants hosted a conference call for analysts, investors and media representatives, during which Defendants represented the following:

[ANALYST:] One more question and then move on. On the commercial real estate growth, the income (inaudible) properties – you had some very strong growth there. Can you comment on where that's coming from and what's driving it?

[ANTHONY:] We can. We've done quite a bit of analysis. In fact, Mark and team have developed a top five in size list of transactions

that occurred during the quarter in each of the major categories. Of course, we wouldn't give you the names, but by type of income-producing properties. Mark, do you want to comment on what drove the growth?

[HOLLADAY:] I really do want to reemphasize what Richard said before I get into the detail. There are really two dynamics occurring in the market. The first is that acquisitions in the past several years have gone straight to the CMBS market. If you look back at our growth over '05 and the first – '06 and the first half of '07, we grew about 1.5% in that area, and about 2% for the first half of '07. As the CMBS market shutdown, some of that growth is accelerated. So we're seeing opportunities for our good customers who are acquiring properties. About 57% of our activity is tied to that kind of area. The rest of the grown is tied to actual new construction. So we're not out there generating a lot of new construction activity. It's fairly normalized. Certainly, we've tightened underwriting requirements there.

We have just finished a review of the top 25 loans that we made in those income categories. I'm walking away feeling very good about it. Our capital requirements have ranged from 21 % to 30% cash in the projects. We're stressing those properties to hold rates of about 7.5%. They all have good, strong guarantors. The guarantors have good liquidity. And we're doing very careful global analysis on the customers. The growth is really spread throughout those three or four or five sectors We've seen some office warehouse, probably the largest area of activity, some hotels would probably fall second in line, and then some multi-family and retail. Our commercial development is down, but those types of properties are – really that's what's causing the growing.

71.     On July 7, 2008, defendant Jones, the CEO and Chairman of Sea

Island, resigned as a director of Synovus. No explanation was provided for Jones'

sudden departure from the Board.

72.     On July 24, 2008, Defendants caused Synovus to announce its second

quarter 2008 financial results in a release that stated in part:

Synovus reports net income for the second quarter of 2008 totaling $12.1 million, or $0.04 per diluted share, compared to income from continuing operations of $105.8 million, or $0.32 per diluted share, for the second quarter of 2007. The second quarter of 2008 results include the impact of a non-cash goodwill impairment charge of $27 million or $0.08 per diluted share as discussed below. This charge has

no impact on tangible equity or regulatory capital ratios since goodwill is already excluded from these measures.

Shareholders' equity as of June 30, 2008, was $3.43 billion, which represented a very strong 10.02% of quarter-end assets. Total assets ended the quarter at $34.2 billion, an increase of 7.1 % when compared to total assets for continuing operations a year ago. The Tier 1 Capital Ratio was 8.91%, the Total Risk-Based Capital Ratio was 12.28%, and the Tangible Common Equity to Tangible Assets Ratio was 8.64%.

The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 3.00%, compared to 2.49% last quarter and 0.87% in the second quarter of last year. Nonperforming loans were $627 million for the second quarter of 2008, an increase of $111 million from the first quarter of 2008. The rate of increase in nonperforming loans slowed in the second quarter (22%) as compared to the previous quarter (51 %). Of the $111 million increase in nonperforming loans, 46% were in the Atlanta area. The Atlanta market represents 58% of Synovus' total nonperforming loans in the residential construction and development portfolios. The net charge-off ratio for the quarter was 1.04% compared to 0.95% last quarter and 0.25% in the second quarter of last year. The allowance for loan losses was 1.52% of loans at June 30, 2008, compared to 1.46% at the end of last quarter and 1.30% at June 30, 2007. The provision expense for the quarter was $93.6 million, compared to $91.0 million last quarter, and $20.3 million in the second quarter last year. The provision for loan losses covered net charge-offs by 133% for the quarter. Total loans past due and still accruing as a percentage of loans outstanding improved from 1.39% last quarter to 1.33% in the second quarter. Past due loans over 90 days and still accruing as a percentage of loans outstanding improved from 0.16% last quarter to 0.14% in the second quarter.

Net interest income for the second quarter was $273.4 million compared to $288.5 million in the second quarter of last year. The net interest margin for the quarter was 3.57%, compared to 3.71% last quarter and 4.00% in the second quarter of last year. Of the 14 basis point decrease in the margin from the previous quarter, 3 basis points were related to increased credit costs. Total loans grew 4.9% (annualized) on a sequential quarter basis. Commercial income producing properties grew 15.4%, commercial and industrial loans grew 6.7% and retail loans grew 16.2%, while residential construction loans declined 33.9%, and residential development loans declined 15.1 % on an annualized sequential quarter basis. Total core deposits (excludes brokered deposits) grew 4.1 % (annualized) on a sequential quarter basis.

Non-interest income was $107.7 million for the quarter. After excluding a $9.9 million net after-tax gain on the sale of MasterCard stock, non-interest income was down 5% compared to the second

quarter last year with increases in brokerage and investment banking revenue of 17.9%, bankcard fees of 22.7%, and fiduciary and asset management fees – which include trust, financial planning, and asset management fees of 1.9%, while mortgage banking income and service charges on deposit accounts were down 26.1 % and 7.1 %, respectively.

Non-interest expenses of $266.0 million were up $68.3 million compared to the second quarter last year. The increase includes the $27 million estimated goodwill impairment charge, $23 million in impaired loans held for sale and other real estate costs, a $4 million provision for unfunded lending commitments, and the $2.4 million civil money penalty that was paid to the FDIC in connection with the settlement agreement related to the credit card programs offered pursuant to our affinity agreement with Synovus Corporation.

During the second quarter of 2008, Synovus conducted its annual goodwill impairment testing. The evaluation resulted in an estimated goodwill impairment charge of $27 million (pre-tax and after-tax) on one of our reporting units. The charge has been recorded as a component of non-interest expense for the second quarter of 2008. The impairment charge is an estimate that will be finalized upon completion of the goodwill impairment testing. The driver of impairment is the decrease in market-based trading and transaction multiples.

73. Notably, the July 24, 2008 press release failed to even mention the Company's single largest customer, Sea Island.

74. After releasing the Company's second quarter 2008 earnings on July 24, 2008, Defendants hosted a conference call for analysts, investors and media representatives where the Sea Island project was specifically addressed:

[ANTHONY:] Credit obviously was the story for the quarter, as it has been for the past few quarters. The pattern that we experienced was very similar to the pattern that you have seen earlier this year and late last year. Our charge-off experience for the quarter was right in the range of 1%, 1.04%. This compares to 95 basis points in the first quarter of 2008. Our nonperforming assets reached a level of 3% in this harsh credit environment.

I would say that the primary story continues to be the Atlanta impact that we're feeling right now. 46% of our increase of $111 million in the quarter occurred in Atlanta. That has to do with nonperforming

loans. And, the Atlanta market represents 58% of our total nonperforming loans in the residential, construction and development portfolios.

So we want to give you a little guidance on credit as we look out into the future. We would anticipate, for the remainder of the year, our charge-offs remaining in that 1 % range. We see our nonperforming asset percentage going up some, but at a slowing pace for the remainder of this year. So we've got a few more quarters of this difficult credit environment to work through.

*     *     *

[ANALYST:] *Considering Jimmy Blanchard's [resignation] from their Board and Bill Jones stepping down from yours, I wonder what details you could give us on the seeming conflict of interest here, I guess, with Sea Island Company, and, if you could give us any detail on that credit relationship?*

[ANTHONY:] What I would say is; Sea Island Company has been a customer for a number of years and a good one. We have a large relationship that really is easier to manage without Bill being on our Board. He had offered to really move off a couple of quarters ago, and they are certainly a good customer with a good relationship. *But for us to work on some of their needs, with his being an insider, would have just really slowed us down. So we think that it was best for everybody to eliminate these potential conflicts.*

[ANALYST:] *Finally, we shouldn't infer that deteriorating credit was a major factor here?*

[ANTHONY:] *No.*

75.    In fact, contrary to Defendants' public representations, by this time, Sea Island was in dire straits.  For example, within mere weeks of these statements, Sea Island would lay off 25% of its workforce.

76.    Due to Defendants' false and misleading statements, the Company's stock price did not collapse on these adverse developments and by the end of July 2008, Synovus stock still traded above $9 per share.

77.    On October 23, 2008, Defendants caused Synovus to report its third

quarter 2008 financial results in a release that stated in part:

> Synovus reported a net loss for the third quarter of 2008 of $26.9 million, or $0.08 per share, compared to income from continuing operations of $83.6 million, or $0.25 per diluted share for the third quarter of 2007.

> "Credit issues, along with a weakening economy, created the need for aggressive actions to appropriately value, write down and dispose of problem credits," said Richard Anthony, Chairman and CEO. "Additionally, we have grown our deposits to enhance our liquidity position and plan to participate in the capital purchase program announced by the Treasury Department on October 13, 2008, which could add approximately $300 to $900 million of Tier 1 capital to our balance sheet. These actions will further strengthen Synovus for the future."

> The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 3.58%, as of September 30, 2008, compared to 3.00% last quarter and 1.16% in the third quarter of 2007. Nonperforming loans were $770 million as of September 30, 2008, an increase of $143 million from the second quarter of 2008. The Atlanta market represents 56% of Synovus' total nonperforming loans in the residential construction and development portfolios. The net charge-off ratio for the quarter was 1.53% compared to 1.04% last quarter and 0.51% in the third quarter of 2007. During the quarter, Synovus recognized an $18 million loss on $70 million of non-performing assets after identifying these assets for loan sales or auctions. Two auctions were completed in the quarter with proceeds of $28 million. Another auction and two loan sales are scheduled to close in November which are expected to reduce nonperforming assets by $24 million. The allowance for loan losses was 1.68% of loans as of September 30, 2008, compared to 1.52% as of June 30, 2008 and 1.38% as of September 30, 2007. The provision expense for the quarter was $151.4 million, compared to $93.6 million last quarter, and $58.8 million in the third quarter of 2007. The provision for loan losses covered net charge-offs by 144% for the quarter.

> During the third quarter, Synovus reassessed its largest loans, representing approximately 14% of the entire portfolio. While all except for one of these loans were performing, Synovus concluded that the financial condition of certain borrowers had weakened. This resulted in the downgrade of certain credits and a corresponding increase in provision expense of $40 million in the quarter.

> In the current environment, Synovus has focused on growing deposits faster than loans. Total deposits grew 27.8% (annualized) on a sequential quarter basis, while Federal funds purchased were reduced by 88.6% enhancing Synovus' overall liquidity position. Total core deposits (excludes brokered deposits) grew 4.3% (annualized) on a

sequential quarter basis. Total loans grew 2.9% (annualized) on a sequential quarter basis. The net interest margin for the quarter was 3.42%, compared to 3.57% last quarter and 3.97% in the third quarter of 2007. Net interest income for the third quarter was $267.8 million compared to $290.8 million in the third quarter of 2007.

Non-interest expense was $258.8 million for the quarter, up $46.4 million compared to the third quarter last year. The increase consists primarily of a $41.5 million increase in losses and costs related to foreclosed real estate (which includes a $17 million loss related to the aforementioned auctions), $9.0 million in restructuring charges associated with Project Optimus, and a $3.4 million increase in FDIC insurance and other regulatory fees. Core non-interest expense was down from the same period last year primarily due to a headcount reduction of 274 during the third quarter of 2008.

Shareholders' equity as of September 30, 2008 was $3.39 billion, which represented a strong 9.87% of quarter-end assets. Total assets as of September 30 were $34.4 billion, an increase of 6.7% when compared to total assets from continuing operations a year ago. As of September 30, 2008, the Tier 1 Capital Ratio was 8.83%, the Total Risk-Based Capital Ratio was 12.22%, and the Tangible Common Equity to Tangible Assets Ratio was 8.50%.

During the three months ended June 30, 2008, Synovus conducted its annual goodwill impairment evaluation. As a result of this evaluation, Synovus recognized a goodwill impairment charge of $27 million (pretax and after-tax) on one of its reporting units. As was previously disclosed, the goodwill impairment charge was preliminary and subject to the finalization of the Step 2 calculation. Synovus expects to complete this process prior to the filing of its Form 10-Q for the three months ended September 30, 2008. Accordingly, any additional impairment charge would be reflected in the financial results for the three months ended September 30, 2008. Although any goodwill impairment charge would further reduce reported GAAP earnings, it would be non-cash in nature and would not affect Synovus' liquidity or regulatory capital ratios.

On October 15, 2008, Synovus received a notification from Visa Inc. stating that it had reached an agreement in principle with Discover to settle litigation pending since 2004. The specific terms of the settlement are not yet available. Synovus and other member banks have obligations to indemnify Visa, on a pro-rata basis, for the losses related to this litigation. As of September 30, 2008, Synovus has accrued $3.8 million as an estimate of its indemnification obligations related to this litigation. The expense related to this liability was recognized in the fourth quarter of 2007. This amount assumed a total settlement by Visa of $650 million. At this time, Synovus has not yet determined the impact of the settlement on its accrued liability at September 30, 2008.

Anthony concluded, "As we look out into the fourth quarter of 2008, we believe that the third quarter elevated level of charge-offs and loan loss provision should decrease and should drive improved performance in the quarter as compared to the third quarter. In looking out to 2009, based upon our assumptions regarding current economic conditions and credit conditions persisting throughout 2009, we believe that the 2009 charge-off ratio will be in the 1.15% to 1.30% range."

78.    Notably, Defendants' October 23, 2008 press release failed to even mention the Company's single largest customer, Sea Island.

79.    Also, on October 23, 2008, Defendants caused the Company to host a conference call for analysts, investors and media representatives, during which Defendants represented the following:

[ANTHONY:] We believe that the fourth quarter provision will moderate from the third quarter's level due to some of the extra costs that we absorbed as a result of the reviews that I mentioned earlier. But our guidance for chargeoffs in the fourth quarter would be approximately 1.15%. If you use that number in your projections, I believe you would find that we should have a chance at being profitable, fundamentally, during the quarter. And in 2009 our guidance for the chargeoff ratio would be in the 115 range to 130 range.

\*    \*    \*

Our strategy is sound. We're not jerking things around there. We are sticking with our emphasis on the C&I strategy the middle market, the business owners that want the trusted advisor who can give service effectively, respond quickly and resolve problems at the local level. That's the way we do business and it's relationship based.

Another positive that we touched on during the call already, but we need to remember it because I think we're doing very well in this regard, has to do with liquidity. Liquidity in general, and certainly, the shared products that I mentioned earlier. And from a credit perspective I know we'll get questions about migration, about indicators beyond the residential portfolio, but, I can say in general, our income-producing investment properties are holding up very well. They still look strong. The portfolio, when I hear of these indicators and weaknesses in our industry, our consumer portfolio still is doing very well. And our credit card business, it's not a large. It's a little

- 32 -

less than $300 million in size. But our indicators there, whether it be past dues or chargeoffs are well below industry averages. And I think it is a tribute to our style of relationship banking.

\*   \*   \*

[ANALYST:] Okay. And thirdly, I would ask, I think you said that there – you have, "a chance at being profitable in the fourth quarter." Which, you know, kind of – I have to read it there is a chance you are not profitable in the fourth quarter. And I guess my question is at what point do you have to just omit the dividend if you have two loss quarters in row is that it or can it go on for a while?

[ANTHONY:] I expect the dividend would go on would be my opinion. We have a good capital position. We got our own view of the future. We have reduced it significantly as you know from $0.17 to $0.06. Our expectation would be that the dividend payment would continue.

\*   \*   \*

[ANALYST:] Most of my questions have been answered but I know it came up on the last conference call, Richard. And the subject of Sea Island Company and that issue came up in the Q and A last time. I was just wondering if you could update us on the status of that. Is it on the watch list or nonaccrual status now or in good standing?

[ANTHONY:] The loan is performing, Kevin, and nothing is really different. They released information to the public a couple months ago about the fact that their financing package had been modified and increased and was in place. And they have had some successes and continue to really represent a premier brand on the East Coast. But we certainly are in constant contact with them and they are working on strategic flexib[ility] for their future and I think doing the right things.

80.     Sea Island was continuing to struggle with severe problems at this time. Occupancy was as low as 20%-30% according to a Sea Island spokesman and *as low as 2%-3% according to a staff member who spoke with a reporter.*

81.     Analysts were convinced that Synovus had been "aggressive" in making loan loss estimates in the third quarter of 2008. As J.P. Morgan stated in a October 24, 2008 report:

Following the quarterly loss tied to aggressive loan loss provisioning and an outlook for charge-offs in the range of 1.25% in 2009, we are reducing our 2008 and 2009 estimates from $0.44 and $0.70 to $0.21 and $0.31, respectively. Importantly, we see the company building [tangible book value] to $8.75 by year end 2009.

82.     Little did analysts realize the loan loss provision for the fourth quarter 2008 would be much greater, leading to a loss in the fourth quarter and a loss for the year, even ignoring the goodwill impairment charge.

83.     On November 14, 2008, Defendants caused Synovus to issue a press release entitled "Synovus Selected to Participate in U.S. Treasury Capital Purchase Program," which stated in part:

> Synovus, the Columbus, Georgia-based financial services company announced today it has received preliminary approval from the U.S. Treasury for the sale of approximately $973 million in preferred stock and related warrants to Treasury under the Capital Purchase Program. The final approval is subject to satisfaction of certain conditions, including approval by Synovus' shareholders of amendments to the company's articles of incorporation and bylaws to allow Synovus to issue preferred stock, as well as the execution of definitive agreements.
>
> The Capital Purchase Program, part of the U.S. Treasury Troubled Asset Relief Program (TARP), is designed to encourage U.S. financial institutions to build capital and increase the flow of financing to U.S. businesses and consumers. Treasury has set aside $250 billion dollars [sic] to invest in the country's strongest financial institutions.
>
> Synovus expects to use the proceeds from the Capital Purchase Program to further strengthen the company's capital base, enhance lending capabilities and position Synovus banks to capitalize on competitive growth opportunities in local markets.
>
> "Through participation in this program, we have the opportunity to gain valuable capital to invest in continued growth and economic recovery in each of the communities we serve," said Richard Anthony, Chairman and CEO of Synovus. "We are especially focused on opportunities to carefully expand our lending efforts to consumers and businesses as we all work through these challenging economic times."

84. On December 19, 2008, Defendants caused Synovus to announce its receipt of *$967.8 million* in federal "bailout" funds.

85. On December 31, 2008, Synovus stock closed at $8.30 per share.

86. On January 2, 2009, Defendants caused Synovus to issue a press release entitled "Synovus Announces Updated Outlook for Fourth Quarter of 2008," which stated in part:

> Synovus, the Columbus, Georgia-based financial services company, announced today its updated outlook for the fourth quarter of 2008.
>
> Synovus expects its fourth quarter loan loss provision, ORE liquidation costs, and charge-offs to remain at elevated levels related to current economic conditions. Synovus also expects to increase its loan loss reserve during the quarter. The current estimate for the fourth quarter loan loss provision is approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%. The largest component of these elevated charges relates to Atlanta market residential real estate credits. Additionally, Synovus is assessing its goodwill for potential impairment during the fourth quarter.

87. Subsequently, on January 3, 2009, Defendants caused Synovus to issue a press release correcting the previously announced outlook for the fourth quarter of 2008 to dramatically increase the expected charge-off ratio from 2.2% to 3.2%. The correction stated in part:

> On January 2, 2009, Synovus Financial Corp., the Columbus, Georgia-based financial services company, issued a press release that incorrectly stated the Company's current estimate for the fourth quarter loan loss provision as approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%. The correct current estimate for the fourth quarter loan loss provision is approximately $350 million with a fourth quarter estimated charge-off ratio of approximately 3.2%.

88.     On January 13, 2009, *Bloomberg* reported that the Company's

commercial real estate could see a second wave of loan losses:

> Synovus, which reports quarterly results on Jan. 22, said Jan. 2 that
> losses on loans and uncollectible debt will "remain at elevated levels."
> The Columbus, Georgia-based company plans to reserve about $250
> million to help cover Atlanta real-estate loans. The bank said in
> November it would sell the U.S. government's Troubled Asset Relief
> Program $973 million in preferred stock and warrants.
>
> The lender has had five quarters of lower profit and losses, and its
> stock has fallen 44 percent in 12 months, compared with 28 percent
> for the KBW Regional Bank Index. The bank's real-estate loan
> portfolio makes up 78 percent of total loans, according to Deutsche
> Bank data. Almost a fifth of loans are in commercial real-estate
> projects like shopping centers and hotels, Synovus spokesman Patrick
> Reynolds said in an interview Jan. 6.
>
> "Stopped Lending"
>
> Synovus "stopped lending to any new projects in the retail sector, in
> the shopping sector, or the hotel sector" in June, Reynolds said.

89.     Following these disclosures, the Company's stock price continued to

decline, reaching as low as $4.51 per share on January 20, 2009, a decline from

$5.56 per share on January 16, 2009.  The drop to $4.51 per share represented a

decline of *66%* from the Relevant Period high of $13.49 per share in February

2008.

90.     Subsequently, on January 22, 2009, Defendants caused Synovus to

issue its financial results for the fourth quarter of 2008, in a release which stated

in part:

> Synovus reported a net loss for the fourth quarter of 2008 of $637
> million, or $1.93 per share, compared to income from continuing
> operations of $53.1 million, or $0.16 per diluted share for the fourth
> quarter of 2007. The fourth quarter 2008 results include provision

expense of $364 million and a $443 million non-cash goodwill impairment charge. Excluding the goodwill impairment charge, Synovus' net loss would have been $195 million, or $0.59 per share, for the quarter.

For the full year 2008, Synovus reported a net loss of $584 million, or $1.77 per share, compared to income from continuing operations of $343 million, or $1.04 per share for 2007. Excluding the goodwill impairment charges of $480 million in 2008, Synovus' net loss would have been $105 million, or $0.32 per share, for the year.

Synovus previously announced that it was reviewing its goodwill for potential impairment. Based on the results of this review, Synovus recorded a non-cash $443 million (pre-tax and after-tax) goodwill impairment charge during the fourth quarter of 2008. This charge had no impact on Synovus' tangible capital levels, regulatory capital ratios, or liquidity. Additionally, goodwill impairment has no connection to or utilization of capital received from the U.S. Treasury as part of the Capital Purchase Program.

"As the economy continued to deteriorate in the fourth quarter, credit quality in the residential construction and development portfolios, especially in Atlanta, continued to weaken," said Richard Anthony, Chairman and CEO. "We are taking actions to recognize and liquidate these non-performing credits as efficiently and economically as possible. During the fourth quarter, our sequential quarter core deposit growth was 11 % (annualized). We believe this puts us in a very strong liquidity position at the end of one of the worst years the financial services industry has faced. Additionally, in the fourth quarter, we received approximately $968 million from the sale of preferred stock and warrants to the U.S. Treasury as part of the government's Capital Purchase Program. As of December 31, 2008, our Tier 1 Capital Ratio was 11.22%, Total Risk-Based Capital Ratio was 14.55%, and Tangible Common Equity to Tangible Assets Ratio was 7.91%. We believe the strength of our liquidity and strong capital structure positions us well for the future."

The provision expense for the quarter was $363.9 million, compared to $151.4 million last quarter. The provision for loan losses covered net charge-offs by 159% for the quarter. For the full year 2008, provision expense of $700 million exceeded net charge-offs by $231 million. The ratio of nonperforming assets to loans, impaired loans held for sale, and other real estate was 4.16%, as of December 31, 2008, compared to 3.58% last quarter. Nonperforming loans were $922 million as of December 31, 2008, an increase of $152 million from the third quarter of 2008. The Atlanta market represents 29% of Synovus' total loans in the residential construction and development portfolios and 45% of the nonperforming loans in the residential construction and development portfolios.

The net charge-off ratio for the quarter was 3.25% compared to 1.53% last quarter. The net charge off ratio for the full year 2008 was 1.71 %. The allowance for loan losses was 2.14% of loans as of December 31, 2008, compared to 1.68% as of September 30, 2008.

During the fourth quarter, Synovus continued to refine its non-performing asset disposal strategy. In addition to the individual bank teams aggressively identifying and liquidating non-performing assets, Synovus formed a separate subsidiary to purchase certain non-performing assets from its subsidiary banks, assess the economics of disposal of these assets, and centrally and effectively manage the liquidation of these assets. This entity has acquired approximately $500 million of these assets as of December 31, 2008 and has identified approximately $150 million of these assets for liquidation in the near term. These assets have been written down an additional $50 million in the fourth quarter to reflect the estimated proceeds from liquidation.

In the current environment, Synovus has focused on growing deposits faster than loans. Total core deposits (excludes brokered deposits) grew 11.1 % (annualized) on a sequential quarter basis and 5.1 % over the 2007 year end balance. Shared deposit products that provide up to $7,750,000 of FDIC insurance per individual account were up $852 million in certificate of deposit and money market accounts in the fourth quarter. Total loans grew 3.9% (annualized) on a sequential quarter basis. Commercial and industrial loans grew 5.9% and retail loans grew 5.5%, while residential construction and development loans declined 15.3% on a sequential quarter annualized basis. The net interest margin for the quarter was 3.20%, compared to 3.42% last quarter. Net interest income for the fourth quarter was $258.0 million compared to $286.7 million in the fourth quarter of 2007.

Reported non-interest expense for the fourth quarter 2008 was $723.2 million. Excluding the goodwill impairment charge, non-interest expense for the fourth quarter of 2008 was $280.5 million compared to $235.2 million in the fourth quarter 2007. The increase consisted primarily of a $59.0 million increase in losses and costs related to foreclosed real estate, $3.7 million increase in professional fees, and a $3.8 million increase in FDIC insurance and other regulatory fees. Synovus' efforts to manage headcount during 2008 have resulted in a reduction of 451 positions and have caused employment expenses to trend downward by $1.9 million on a linked quarter basis. For the full year 2008, no executive bonuses were paid.

Anthony concluded, "As we look out into 2009, we are fully committed to actively and aggressively deal with our non-performing assets through the activities of our front line bankers as well as the separate subsidiary structured to enhance this capability from the corporate level. We believe continued strong core deposit growth and the U.S. Treasury funds enable us to be aggressive in resolving these credit issues while allowing us to look to the future for growth."

91.     Notably, Defendants did not mention the Company's Sea Island

exposure in the press release nor in the scripted portion of their quarterly

conference call.  However, Sea Island was brought up in the question and answer

portion of the conference call when Sea Island was acknowledged to be the

Company's largest customer.  The best Defendants could say was that the loan was

"performing":

> [ANALYST:]     If I missed it, I'm sorry. Did you address [Sea Island] at all, and the size of the exposures, et cetera, et cetera.? It's been much [in] the news lately, I think down in Atlanta.

> [ANTHONY:] It has, and I'm going to ask Fred to make a comment there.

> [GREEN:] *Nancy, what we say about Sea Island is they are our largest customer. I won't get into the net amount of our loan there, but what I will say is that loan is a performing loan. We have very frequent interaction with the Company and the principles, because of the size of the loan and that being our largest customer.* As I said, it is a performing loan.

> [ANALYST:] Has that loan been re-structured? Is that part of its remaining performing? Because my understanding is that Sea Island, the development, is not great shape.

> [GREEN:] They are in, as you know, the resort business. That's an area that's suffering throughout the country. That loan has not been restructured. We are talking to them about opportunities to do that, but at this point it has not been restructured and is current as well.

> [ANTHONY:] And the reference Fred is making would have to do with a longer term. The Company is performing within the maturities that have been established and with all the covenants and payment requirements, but if possible, we would like to work out a longer term maturity and those conversations are going on. There are other bank partners with us, and the activity levels have been pretty good down there. I was down there last weekend and was impressed with what I saw.

92.     Once the information regarding the Company's true exposure to

Sea Island, Synovus stock fell to $4.75 per share.

93.    Thus, even though Sea Island was the Company's largest customer, Defendants failed to mention the Company's true exposure to it in *any* Relevant Period filing with the SEC.

94.    The true facts, which were known by the Defendants but concealed during the Relevant Period, were as follows:

> A. The Company's assets contained hundreds of millions of dollars worth of impaired and risky securities, many of which were backed by real estate that was rapidly dropping in value for which Defendants had failed to record adequate loan loss reserves;

> B. Prior to and during the Relevant Period, Defendants had been extremely aggressive in granting credit, including to Sea Island, where top officers of each company sat on each other's boards and whose enormous development projects were highly risky, and would be enormously problematic if the value of residential real estate did not continue to increase and if the tourism market slowed, which was then already happening;

> C. Synovus's largest customer, Sea Island, was performing extremely poorly – so much so that by August of 2008, the resort laid off

25% of its employees;

D. Defendants failed to properly account for Synovus's real estate loans, failing to reflect impairment in the loans;

E. Synovus's balance sheet included hundreds of millions of dollars in impaired goodwill which had not been recorded as losses on a timely basis;

F. Defendants had not adequately reserved for loan losses and goodwill impairment such that the Company's financial statements were presented in violation of GAAP; and

G. Synovus was not on track to report the earnings being forecast for it.

95.     As a result of Defendants' false and misleading statements, Synovus stock traded at inflated levels during the Relevant Period. However, after the truth emerged, the Company's shares were hammered by massive sales, sending them down more than 66% from their Relevant Period high.

96.     Subsequently, Defendants continued to reveal adverse information, including a first quarter loss and a massive restructuring of the Sea Island debt.

97.     Defendants also confirmed that the Sea Island exposure was highly significant, attributing *half a billion dollars* in increased non-performing assets in

the first quarter of 2009 to Sea Island.  As the *Atlanta Business Chronicle* reported

on April 22, 2009:

> Nonperforming loans now stand at $1.4 billion, *after the $519 million increase during the quarter*, according to a company announcement after the markets closed Wednesday.
>
> *The increase in nonperforming loans, the company said, is almost exclusively due to "one resort/hotel relationship, which is being restructured, and was classified as non-performing during the quarter."*
>
> The resort/hotel loan is likely Synovus' large lending relationship with Sea Island Co. for the re-development of the iconic Georgia coastal resort. The Sea Island Co. announced earlier today it is close to an agreement with Synovus to restructure that debt.

98.    Most recently, on October 23, 2009, Defendants disclosed third-

quarter 2009 losses for the Company of $437.7 million, or $1.27 per share, up

sharply from a loss of $40.1 million, or 12 cents per share, for the same period in

2008.  The Company's non-performing assets totaled $918.5 million, nearly double

the year-ago figure, and net charge-offs totaled nearly $496.8 million, up nearly

four times the total from a year ago.

99.    The Company's stock price has never recovered, and Synovus

stock now trades at slightly more than $2 per share.

## DERIVATIVE AND DEMAND ALLEGATIONS

100.    Plaintiff brings this action derivatively in the right and for the benefit

of Synovus to redress injuries suffered, and to be suffered, by Synovus as a direct

result of the breaches of fiduciary duty, abuse of control, and unjust enrichment,

gross mismanagement, and waste of corporate assets as well as the aiding and abetting thereof, by Defendants. Synovus is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

101. Plaintiff will adequately and fairly represent the interests of Synovus in enforcing and prosecuting its rights, and he has retained counsel experienced in litigating this type of action.

102. Plaintiff is and was an owner of the stock of Synovus during times relevant to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

103. Based on the events described above, on August 4, 2009, Plaintiff issued a demand (the "Demand") on the Board to commence an action against certain current and former directors and executive officers of Synovus. A copy of Plaintiff's Demand is attached hereto as Exhibit A.

104. Less than three months later, on October 26, 2009, Plaintiff's counsel received a letter from Samuel F. Hatcher, the Company's General Counsel, stating that the Board had decided to reject the Demand (the "Refusal"). A copy of the Refusal is attached hereto at Exhibit B.

105. The Board's peremptory Refusal was improper when issued because it

was only issued after a perfunctory review of the Demand and, accordingly, could not have been issued in good faith.

106.   There is no indication from the Refusal that the Board ever appointed a committee, retained independent counsel or other independent advisors, nor otherwise took any meaningful action whatsoever to investigate the allegations set forth in the Demand.

107.   Having failed to perform any meaningful investigation nor otherwise adequately inform themselves, the Board's Refusal of the Demand was not in good faith.

## COUNT I
## BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

108.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Synovus disseminated accurate, truthful and complete information to its shareholders.

110.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Synovus shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings

- 44 -

and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

111. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

112. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

113. As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

114. Defendants willfully ignored the obvious and pervasive problems with Synovus's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

115. As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

116.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.   Defendants owed and owe Synovus fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Synovus the highest obligation of good faith, fair dealing, loyalty and due care.

118.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

119.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Synovus has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

120.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

121.   Plaintiff, on behalf of Synovus, has no adequate remedy at law.

## COUNT IV
## UNJUST ENRICHMENT

122.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.   By their wrongful acts and omissions, the Defendants were unjustly

enriched at the expense of and to the detriment of Synovus.

124.   Plaintiff, as a shareholder and representative of Synovus, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## ABUSE OF CONTROL

125.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Synovus, for which they are legally responsible.   In particular, Defendants abused their positions of authority by causing or allowing Synovus to misrepresent material facts regarding its financial position and business prospects.

127.   As a direct and proximate result of Defendants' abuse of control, Synovus has sustained significant damages.

128.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

129.   Plaintiff, on behalf of Synovus, has no adequate remedy at law.

## COUNT VI
## GROSS MISMANAGEMENT

130.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.   Defendants had a duty to Synovus and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Synovus.

132.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Synovus in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Synovus's affairs and in the use and preservation of Synovus's assets.

133.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Synovus to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Synovus, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged Synovus.

## COUNT VII
## WASTE OF CORPORATE ASSETS

134. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135. As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Synovus to incur (and Synovus may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

136. As a result of this waste of corporate assets, Defendants are liable to the Company.

137. Plaintiff, on behalf of Synovus, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing Synovus to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging

- 49 -

events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

  C. Awarding to Synovus restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

  D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

  E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

  Plaintiff demands a trial by jury.

- 50 -

Dated: November 3, 2009

**HOLZER HOLZER & FISTEL, LLC**

Corey D. Holzer
Georgia Bar Number: 364698
Michael I. Fistel, Jr.
Georgia Bar Number: 262062
Marshall P. Dees
Georgia Bar Number: 105776
William W. Stone
Georgia Bar Number: 273907
200 Ashford Center North
Suite 300
Atlanta, Georgia 30338
Telephone:  770-392-0090
Facsimile:  770-392-0029

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  (610) 225-2677
Facsimile:  (610) 225-2678

Counsel for Plaintiff

## SYNOVUS FINANCIAL CORP. VERIFICATION

I, Charles K. Miller, hereby verify that I am familiar with the allegations in the

Complaint, and that I have authorized the filing of the Complaint, and that the foregoing

is true and correct to the best of my knowledge, information, and belief.


Date: _Nov 2_____, 2009               _____

                                      Charles K. Miller

# EXHIBIT A



## THE WEISER LAW FIRM, P.C.

121 N. WAYNE AVENUE, SUITE 100
WAYNE, PA 19087
TELEPHONE: (610) 225-2677
FACSIMILE: (610) 225-2678
WWW.WEISERLAWFIRM.COM

August 4, 2009

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Richard E. Anthony
Chairman of the Board, President, and Chief Executive Officer
Synovus Financial Corporation
1111 Bay Avenue
Suite 500
Columbus, GA 31901

Re:   **Shareholder Demand Pursuant to Ga. Code Ann. § 14-2-742**

Dear Mr. Anthony:

This firm represents Charles K. Miller (the "Stockholder"), a current stockholder of Synovus Financial Corporation ("Synovus" or the "Company"). Pursuant to Ga. Code Ann. § 14-2-742, I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company, including yourself ("Anthony"), Daniel P. Amos ("Amos"), Gardiner W. Garrard, Jr. ("Garrard"), J. Neal Purcell ("Purcell"), T. Michael Goodrich ("Goodrich"), Melvin T. Stith ("Stith"), James H. Blanchard ("Blanchard"), V. Nathaniel Hansford ("Hansford"), Phillip W. Tomlinson ("Tomlinson"), Richard Y. Bradley ("Bradley"), Mason H. Lampton ("Lampton"), William B. Turner, Jr. ("Turner"), Frank W. Brumley ("Brumley"), Elizabeth C. Ogie ("Ogie"), James D. Yancey ("Yancey"), Elizabeth W. Camp ("Camp"), H. Lynn Page ("Page"), Frederick L. Green III ("Green"), Thomas J. Prescott ("Prescott"), Mark G. Holladay ("Holladay"), and William Jones III ("Jones"). Collectively, the foregoing executive officers and/or directors of the Company will be referred to herein as "Management."

As you are aware, by reason of their positions as officers and/or directors of Synovus and because of their ability to control the business and corporate affairs of Synovus, Management owed and owes Synovus and its shareholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use their utmost ability to control and manage Synovus in a fair, just, and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if

1

necessary, make such disclosures as necessary to comply with all applicable laws. The Stockholder believes that Management has violated these core fiduciary duty principles from at least January 2008 through the present (the "Relevant Period"), causing Synovus to suffer damages.[1]

## I.   BACKGROUND

Synovus is a Georgia corporation headquartered in Columbus, Georgia. According to its public filings, Synovus operates as a bank holding company. Synovus offers commercial banking services, including commercial, financial, agricultural, and real estate loans, as well as various retail banking services comprising accepting customary types of demand and savings deposits; making individual, consumer, installment, and mortgage loans; safe deposit services; leasing services; automated banking services; automated fund transfers; Internet based banking services; and bank credit card services, including MasterCard and Visa services. The Company also provides professional portfolio management, investment banking, securities brokering, and individual investment advice; and trust, mortgage, insurance agency, financial planning, and asset management services.

In late 2007, Synovus spun off its credit card processing subsidiary, Total System Services ("TSYS"), when Bank of America began shifting its consumer card processing in-house. Bank of America had been TSYS's largest customer, accounting for 25% of TSYS's revenues and 10% of the Company's revenues. Following the spin-off of TSYS, Synovus was much more dependent on its core banking operations. By mid-January 2008, following the spin-off of TSYS, Synovus stock was trading at less that $11 per share.

One large banking-related exposure Synovus had by late 2007 involved a large financing outstanding to the Sea Island Resort ("Sea Island") located on the Georgia coast. Jones, who was Sea Island's Chairman and Chief Executive Officer ("CEO"), embarked on an ambitious project from 2004 to 2006 to convert Sea Island from a regional destination catering to wealthy families in the Southeast to a worldwide destination. In an effort to finance this enormous makeover, Jones turned to Blanchard, the then-CEO and President of Synovus. Blanchard would serve on Sea Island's board of directors and Jones was given a seat on the Company's Board in 2001. Synovus was the lead lender for Sea Island, and gradually increased its exposure to hundreds of millions of dollars. Management disclosed that the Company was involved with Sea Island, but did not disclose the full extent of the Company's exposure to Sea Island, nor did Management disclose the extent of Sea Island's deteriorating condition.

---

1 This is particularly the case with respect to members of the Board's Audit Committee (the "Audit Committee"). Pursuant to the Audit Committee's Charter, its members are responsible for, *inter alia,* oversight of the Company's earnings press releases and financial statements. Furthermore, the Audit Committee is specifically charged with monitoring and overseeing the Company's credit risk, "including the level and adequacy of the allowance for loan and lease losses, the level of credit concentrations and compliance with applicable policies, limits, activities and procedures."

Sea Island's development project turned out to be much more expensive than planned with the cost per hotel room exceeding $1 million, compared to a typical five-star hotel which can be built for $400,000 per room. These cost overruns increased the risk level for the project and magnified any shortfall in revenue. This overrun coincided with a downturn in tourism nationally, which adversely affected Sea Island. As the real estate market took a turn for the worse in 2007, Management said little about Sea Island and, when asked about it, assured investors it was not a problem.

Consequently, during the Relevant Period, Management caused Synovus to issue a series of false and misleading press releases announcing its financial results and caused the Company to file false and misleading quarterly and annual reports with the SEC. These press releases and quarterly and annual reports were each materially false and misleading because they concealed, *inter alia*, that the Company's assets contained hundreds of millions of dollars worth of impaired and risky securities, many of which were backed by real estate that was rapidly dropping in value for which Management had failed to adequately set aside loan loss reserves.

## II.    MANAGEMENT'S FALSE AND MISLEADING STATEMENTS

On January 24, 2008, after releasing the Company's fourth quarter 2007 and fiscal year 2007 earnings, Management hosted a conference call for analysts, investors and media representatives where the Sea Island project was specifically addressed:

> [PRESCOTT:] [Y]ou'll see TSYS that's presented in discontinued operations line, and we'll certainly discontinue talking about TSYS going forward, but just one more time, I got to say that our great subsidiary has now been spun has left us in great order, and had a great year in 2007, and a great finish to that.
>
> &ast; &ast; &ast;
>
> [GREEN:] We've been aggressive in our approach of recognizing problems and reserving appropriately.
>
> This past quarter we've reviewed our entire portfolio with a fine- tooth comb. The purpose was to recognize all of our problems as quickly as possible and to make sure that we're not inadvertently dragging current problems into future periods. So at this point, our credit issues have been contained both geographically and by product type. . . .
>
> *I also want to point out a little bit about how aggressively – or how I guess, I should say conservatively, we're looking at loans and reserving appropriately. And we've never shared this with you, but our methodology for these types of loans that I just discussed, we would allocate 22.7% reserves on all loans that migrate to substandard but are still accruing. So at this point in which we're concerned about their ability to continue to pay us, but they haven't hit that point. They're still*

3

*accruing the interest. We reserve 22.7% of the value of that loan.*

*If these loans continue to deteriorate and we recognize that they can no longer perform, we'll run an impairment test that calls for us to get a current fair value appraisal, discounted about 10% for selling costs. We can work through the [math], but generally, a $4 million loan that might have had an original appraisal of 5 to 8% after we reserve – again, still accruing, That loan is around 60% of the original amount.*

If we look at the loans that this quarter have moved into our MPA category compare the charge offs that were result of this going through this impairment task that I just mentioned, the charge offs have actually been less in the aggregate than the 22.7% reserve. We previously established – we continue to establish as these type loans migrate towards that substandard category.

So again, we are attacking the problem as quickly as possible. We're aggressively working through it. And our desire is as this credit cycle turns, we'll be the first to come out of it.

Based on Management's assurances, analysts forecasted that Synovus would have earnings of $0.98 per share in 2008. Synovus common stock, which had dropped to $10.80 per share after the spin-off of TSYS, rebounded to above $13 per share following these positive statements. Next, after releasing the Company's first quarter 2008 earnings on April 24, 2008, Management hosted a conference call for analysts, investors and media representatives, during which Management represented the following:

[ANALYST:] One more question and then move on. On the commercial real estate growth, the income (inaudible) properties – you had some very strong growth there. Can you comment on where that's coming from and what's driving it?

[ANTHONY:] We can. We've done quite a bit of analysis. In fact, Mark and team have developed a top five in size list of transactions that occurred during the quarter in each of the major categories. Of course, we wouldn't give you the names, but by type of income- producing properties. Mark, do you want to comment on what drove the growth?

[HOLLADAY:] I really do want to reemphasize what Richard said before I get into the detail. There are really two dynamics occurring in the market. The first is that acquisitions in the past several years have gone straight to the CMBS market. If you look back at our growth over '05 and the first – '06 and the first half of '07, we grew about 1.5% in that area, and about 2% for the first half of '07. As the CMBS market shutdown, some of that growth is accelerated. So we're seeing opportunities for our good customers who are acquiring properties. About 57% of our activity

is tied to that kind of area. The rest of the grown is tied to actual new construction. So we're not out there generating a lot of new construction activity. It's fairly normalized. Certainly, we've tightened underwriting requirements there.

*We have just finished a review of the top 25 loans that we made in those income categories. I'm walking away feeling very good about it.* Our capital requirements have ranged from 21 % to 30% cash in the projects. We're stressing those properties to hold rates of about 7.5%. They all have good, strong guarantors. The guarantors have good liquidity. And we're doing very careful global analysis on the customers. The growth is really spread throughout those three or four or five sectors We've seen some office warehouse, probably the largest area of activity, some hotels would probably fall second in line, and then some multi-family and retail. Our commercial development is down, but those types of properties are – really that's what's causing the growing.

On July 7, 2008, Jones, the CEO and Chairman of Sea Island, resigned from the Company's Board. Then, on July 24, 2008, after releasing the Company's second quarter 2008 results, Management hosted a conference call for analysts, investors and media representatives where the Sea Island project was specifically addressed:

[ANALYST:] Considering Jimmy Blanchard's [resignation] from their Board and Bill Jones stepping down from yours, I wonder what details you could give us on the seeming conflict of interest here, I guess, with Sea Island Company, and, if you could give us any detail on that credit relationship?

[ANTHONY:] *What I would say is; Sea Island Company has been a customer for a number of years and a good one. We have a large relationship that really is easier to manage without Bill being on our Board. He had offered to really move off a couple of quarters ago, and they are certainly a good customer with a good relationship. But for us to work on some of their needs, with his being an insider, would have just really slowed us down. So we think that it was best for everybody to eliminate these potential conflicts.*

[ANALYST:] Finally, we shouldn't infer that deteriorating credit was a major factor here?

[ANTHONY:] *No.*

In fact however, contrary to Management's public representations, Sea Island was in dire straits by this time. Within weeks of the above statements by Management, Sea Island would lay off 25% of its workforce. Due to Management's false and misleading statements, the Company's stock price did not collapse on these adverse developments and by the end of July 2008, Synovus

stock still traded above $9 per share. Then, on October 23, 2008, Management hosted a conference call for analysts, investors and media representatives, during which Management represented the following:

> [ANALYST:] Most of my questions have been answered but I know it came up on the last conference call, Richard. And the subject of Sea Island Company and that issue came up in the Q and A last time. I was just wondering if you could update us on the status of that. Is it on the watch list or nonaccrual status now or in good standing?
>
> [ANTHONY:] The loan is performing, Kevin, and nothing is really different. They released information to the public a couple months ago about the fact that their financing package had been modified and increased and was in place. And they have had some successes and continue to really represent a premier brand on the East Coast. But we certainly are in constant contact with them and they are working on strategic flexib[ility] for their future and I think doing the right things.

## III.    THE TRUTH BEGINS TO EMERGE

At the end of 2008, Sea Island was continuing to experience severe problems. Occupancy was as low as 20%-30% according to a Sea Island spokesman and as low as 2%-3% according to one staff member who spoke with a reporter. Analysts were still convinced, however, that Synovus had been "aggressive" in making loan loss estimates in the third quarter of 2008. As J.P. Morgan stated in a October 24, 2008 report: "[i]mportantly we see the company building [tangible book value] to $8.75 by year end 2009."

Little did analysts realize that the Company's loan loss provision for the fourth quarter of 2008 would be much greater, leading to a loss for the Company in the fourth quarter and a loss for the year, even ignoring the goodwill impairment charge.[2]   This was further evidenced on November 14, 2008, when Management issued a press release entitled "Synovus Selected to Participate in U.S. Treasury Capital Purchase Program," which indicated that the Company was selected to participate in the Capital Purchase Program of the U.S. Treasury Troubled Asset Relief Program ("TARP").[3]   On December 19, 2008, Management announced that Synovus had formally accepted federal taxpayer funds from the U.S. Treasury, by completing the sale of $967.8 million in preferred stock and warrants. Then, on January 2, 2009, Management issued a press release entitled "Synovus Announces Updated Outlook for Fourth Quarter of 2008," that stated in part:

---

[2] In actuality, on January 22, 2009 Management caused the Company to announce a $637 million loss for the fourth quarter of 2008, which resulted in a $584 million loss for the full year 2008.

[3] The Emergency Economic Stabilization Act of 2008 (commonly referred to as the "bailout" of the U.S. financial system) had been enacted in October 2008 in response to the credit crisis, authorizing the U.S. Secretary of the Treasury to utilize up to $700 billion to purchase distressed assets and make capital injections into numerous corporations.

Synovus, the Columbus, Georgia-based financial services company, announced today its updated outlook for the fourth quarter of 2008.

*Synovus expects its fourth quarter loan loss provision, ORE liquidation costs, and charge-offs to remain at elevated levels related to current economic conditions. Synovus also expects to increase its loan loss reserve during the quarter.* The current estimate for the fourth quarter loan loss provision is approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%. The largest component of these elevated charges relates to Atlanta market residential real estate credits. Additionally, Synovus is assessing its goodwill for potential impairment during the fourth quarter.

Subsequently, on January 3, 2009, Management caused the Company issue a press release "correcting" the previously announced outlook for the fourth quarter of 2008 to dramatically *increase the expected charge-off ratio from 2.2% to 3.2%.* The "correction" stated in part:

January 2, 2009, Synovus Financial Corp., the Columbus, Georgia-based financial services company, issued a press release that incorrectly stated the Company's current estimate for the fourth quarter loan loss provision as approximately $250 million with a fourth quarter estimated charge-off ratio of approximately 2.2%. The correct current estimate for the fourth quarter loan loss provision is approximately $350 million with a fourth quarter estimated charge-off ratio of approximately 3.2%.

On January 13, 2009, *Bloomberg* reported that the Company's commercial real estate holdings could see a second wave of loan losses:

Synovus, which reports quarterly results on Jan. 22, said Jan. 2 that losses on loans and uncollectible debt will "remain at elevated levels." The Columbus, Georgia-based company plans to reserve about $250 million to help cover Atlanta real-estate loans. The bank said in November it would sell the U.S. government's Troubled Asset Relief Program $973 million in preferred stock and warrants.

The lender has had five quarters of lower profit and losses, and its stock has fallen 44 percent in 12 months, compared with 28 percent for the KBW Regional Bank Index. The bank's real-estate loan portfolio makes up 78 percent of total loans, according to Deutsche Bank data. Almost a fifth of loans are in commercial real-estate projects like shopping centers and hotels, Synovus spokesman Patrick Reynolds said in an interview Jan. 6.

"Stopped Lending"

*Synovus "stopped lending to any new projects in the retail sector, in the shopping sector, or the hotel sector" in June, Reynolds said.*

After these disclosures, the Company's stock price continued to decline, reaching as low as $4.51 per share on January 20, 2009, a decline from $5.56 per share on January 16, 2009. The drop to $4.51 per share represented a decline of 66% from the Relevant Period high of $13.49 per share in February 2008. Subsequently, on January 22, 2009, Management issued the Company's financial results for the fourth quarter of 2008, and notably failed to mention any exposure to Sea Island. However, Sea Island's status was brought up during Management's quarterly conference call, and investors were finally informed of the serious problems at Sea Island:

> [ANALYST:] If I missed it, I'm sorry. Did you address the Island at all, and the size of the exposures, et cetera, et cetera.? It's been much [in] the news lately, I think down in Atlanta.

> [ANTHONY:] It has, and I'm going to ask Fred to make a comment there.

> [GREEN:] *Nancy, what we say about Sea Island is they are our largest customer. I won't get into the net amount of our loan there, but what I will say is that loan is a performing loan. We have very frequent interaction with the Company and the principles, because of the size of the loan and that being our largest customer. As I said, it is a performing loan.*

> [ANALYST:] Has that loan been re-structured? Is that part of its remaining performing? Because my understanding is that Sea Island, the development, is in not great shape.

> [GREEN:] *They are in, as you know, the resort business. That's an area that's suffering throughout the country. That loan has not been restructured. We are talking to them about opportunities to do that, but at this point it has not been restructured and is current as well.*

> [ANTHONY:] And the reference Fred is making would have to do with a longer term. The Company is performing within the maturities that have been established and with all the covenants and payment requirements, but if possible, we would like to work out a longer term maturity and those conversations are going on. There are other bank partners with us, and the activity levels have been pretty good down there. I was down there last weekend and was impressed with what I saw.

## III.   DEMAND PURSUANT TO GA. CODE ANN. § 14-2-742

Based on these events, the Stockholder contends that Management: (i) breached their fiduciary duties of loyalty and good faith in connection with their management, operation and oversight of the Company's business; (ii) breached their fiduciary duty of good faith to establish and maintain adequate internal controls; (iii) breached their fiduciary duties by disseminating false, misleading and/or incomplete information; and (iv) breached their fiduciary duties by knowingly accounting for loan losses in violation of GAAP.   As a result of the foregoing breaches of duty, Synovus has sustained damages.

Accordingly, pursuant to Ga. Code Ann § 14-2-742, on behalf of the Stockholder, I hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Georgia and/or federal law and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

Pursuant to Georgia law, if within ninety (90) days after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

THE WEISER LAW FIRM, P.C.

Robert B. Weiser/bds

Robert B. Weiser

cc:   Charles K. Miller

9

# EXHIBIT B



## SYNOVUS

**SAMUEL F. HATCHER**
General Counsel

October 26, 2009

**VIA EMAIL (RW@Weiserlawfirm.com) AND OVERNIGHT MAIL**

Robert B. Weiser, Esq.
The Weiser Law Firm, P.C.
121 N. Wayne Avenue
Suite 100
Wayne, PA  19087

      Re:   Synovus Financial Corp.

Dear Mr. Weiser:

      In response to your letter dated August 4, 2009, please be advised that the Board of Directors of Synovus Financial Corp. has decided to reject your client's derivative demand.

      Please contact John Latham of Alston & Bird LLP with any questions regarding this matter.

                  Sincerely,

                  Samuel F. Hatcher
                  General Counsel
                  Synovus Financial Corp.
                  Post Office Box 120
                  Columbus, Georgia  31902

cc:    John L. Latham, Esq. (john.latham@alston.com)